OPINION. Hill, Judge: Petitioner claims exemption under section 101 (8) as a civic league “not organized for profit but operated exclusively for the promotion of social welfare.” The respondent contends that petitioner fails to meet the requirements of the statute. The fact that petitioner was in a business which is ordinarily carried on for profit or that it was formed to make profit is not necessarily fatal to its claim, Debs Memorial Radio Fund, Inc. v. Commissioner, 148 Fed. (2d) 948, unless the facts disclose that a substantial portion of its net earnings was distributed or distributable to its members during the taxable year involved. In that event it could not be said that petitioner operated exclusively for the promotion of social welfare or for “charitable, educational, or recreational purposes.” Sec. 101 (8), Internal Kevenue Code. We have found as a fact that petitioner was organized for a profit-making purpose, despite the statement in the certificate of incorporation that it was formed “for mutual help, not conducted for profit.” Helen Hall, one of its founders and directors, testified as follows at the trial: Q. It was not your idea that milk should be sold to the public without a profit being made? A. No. Q. It was only to have a reasonable profit? A. That is right. On brief petitioner requested the following finding of fact: “* * * All of the petitioner’s operations are intended to return a fair profit, without any price-cutting below cost. * * *” The facts also show that a substantial portion of petitioner’s net earnings was distributed or distributable for purposes other than social welfare. Petitioner’s bylaws provide for the distribution of “net earnings from the operation of the business” in the form of patronage dividends “to consumer members and to producer members.” Meyer Parodneck, petitioner’s president and another of its directors, stated that petitioner was not formed to operate on a price-cutting basis, but followed a cooperative principle of selling at the lowest possible retail rates and dividing the profits among the members in proportion to the amount of milk that had been sold to or purchased from petitioner. The foregoing statement might indicate a contention on the part of petitioner that it was exempt from tax as a cooperative under section 101 (12), notwithstanding its disavowal of such claim. If petitioner is advancing such contention, we direct attention to the fact that neither section 101 (12) nor any other provision of the revenue law exempts from tax a consumer’s cooperative. However, assuming arguendo, that petitioner may properly contend that it is exempt from tax as a consumers’ cooperative, it has not brought itself within the requirements of law providing for tax exemption as a cooperative. It appears that all of the patronage dividends declared payable to the producer (or farmer) members from .1943 earnings were paid. It also appears that less than 3 per cent of the dividends declared payable to consumer members out of earnings for such year was paid. Regarding dividends declared payable to consumer patrons, the facts show (1) that such declared dividend was 15 cents per hundred quarts of milk purchased during the dividend year, (2) that to entitle a consumer patron to claim and receive a dividend he must separate .from the cardboard milk container a voucher for each quart of milk purchased and present it as proof of his purchase, (3) for each 100 vouchers so presented the patron would be entitled to a 15-cent dividend, less a 25-cent membership fee, and (4) petitioner canceled all such unclaimed dividends after the lapse of one year. In view of the restrictions as to payment of dividends to consumer patrons, it is small wonder that, of the $25,920.88 of dividends declared payable to them from 1943 earnings, only $871.05 was claimed and paid. The record shows that the total amount of dividends declared payable to consumers for the fiscal years 1939 to 1943, inclusive, amounted to $39,922.53 and of this amount only $3,050.25 was paid. The result is that at the end of the fiscal year 1943 petitioner had a net -worth of $15,211.18. This net worth represents a surplus from earnings. The record does not disclose the amount of net earnings for the fiscal year 1943. It does not disclose the amount of such earnings placed in the general reserve fund. It does appear that no part of such earnings was put into the fund for cooperative education in the fiscal year 1943. The record does not disclose the proportion of the net earnings in 1943 which was declared payable as dividends to patrons, or what amount, if any, of the net earnings was not disposed of as above indicated. - Neither petitioner’s certificate of incorporation nor its bylaws contains any statement concerning the distribution of its surplus. We believe the members of petitioner are the equitable owners of the surplus, as are the stockholders of an ordinary corporation, and that upon dissolution any surplus would be distributable to them. In any event, since section 22, New York’s Co-Operative Corporation Law (McKinney’s Consolidated Laws of New York, vol. 10 (a)) provides that surplus shall be distributed in accordance with the articles of incorporation or bylaws, the members, by amending the bylaws, could provide for the distribution of any surplus to themselves. We believe, therefore, that petitioner has not proved that it was not operated for profit, but exclusively for the promotion of social welfare. The stated conclusion is further fortified by a consideration of the burden and impracticability of complying with the conditions upon which consumer dividends are payable. It will be observed that only a comparatively insignificant portion of the dividends declared payable to consumer patrons was paid. We think it inescapable that petitioner anticipated that result, since under the provision of the bylaws respecting dividends to consumer patrons no other result could reasonably have been intended. We think, therefore, that it was not petitioner’s expectation or intention that the main portion of the dividends declared payable or distributable to consumer patrons would be paid. Petitioner made no door-to-door deliveries of milk and apparently had no arrangement with consumers to take a certain quantity of milk daily or oh any other time basis. It had no record showing who were its consumers or how much milk any consumer purchased during the year. The consumer went personally to the retail milk station and purchased and paid for each quart of milk when purchased. Obviously, petitioner had no subscribing and contract consumers. In declaring dividends for consumer patrons petitioner could only declare a total amount determined by the total quantity of milk sold during the fiscal year. It did not and could not declare a patronage dividend in a definite amount to any individual consumer patron. We think it improbable that petitioner expected or intended that more than a negligible number of its consumer patrons would tear off, hoard during the year, and present purchase vouchers for the meager dividend of 15 cents per hundred quarts, less a 25-cent membership fee. Also, we think it improbable that petitioner contemplated or intended that it would be put to the task of counting fifteen million (the number of quarts of milk sold in 1943) vouchers in individual consumer lots to determine to whom and in what amounts the declared dividends were to be paid. The obvious practical result of the operation in respect to consumer dividends was that petitioner built up a substantial net surplus out of its earnings which was not distributable as patronage dividends, but was, in our opinion, distributable in case of dissolution to petitioner’s members as equitable owners. We think, however, that under the facts here the distribution of so-called patronage dividends was a distribution of profits to the members who received them. Industrial Addition Association, 1 T. C. 378; affd., 149 Fed. (2d) 294; see also Automobile Club of St. Paul, 12 T. C. 1152. See Better Business Bureau of Washington, D. C., Inc. v. United States, 326 U. S. 279. Petitioner maintains, however, that it was not organized for profit, but exclusively for the promotion of social welfare within the meaning of the section involved. It states under this argument that “the major purpose of the petitioner [was] to increase the consumption of milk in low income families by passing on the economies of a special type of distribution.” It points out the many reforms it was interested in, such as eliminating grading of milk in New York City, and distributing milk in paper cartons at the same price as bottled milk. It carried on educational programs among farmers and consumers alike. As shown in our findings, however, only a small percentage of petitioner’s income was set aside each year for educational purposes and after 1942 no additional sums were added to this fund. And as indicated above, petitioner also operated for a return of profit which was or might become distributable to its members otherwise than as so-called patronage dividends, and, therefore, we can not agree with petitioner that it was operated exclusively for social welfare. The cases which petitioner cites in support of its argument are distinguishable. In Debs Memorial Radio Fund, Inc. v. Commissioner, supra, the profits of the taxpayer were used for its ultimate purpose of maintaining a free public forum for educational, cultural, and social services, “without financial gain to any individual.” The taxpayer was prohibited by its bylaws from using profits or surplus as dividends. In United States v. Pickwick Electric Membership Corporation, 158 Fed. (2d) 272; Hanover Improvement Society, Inc. v. Gagne, 92 Fed. (2d) 888; and Garden Homes Co. v. Commissioner, 64 Fed. (2d) 593, the courts found as a fact that the taxpayers were not organized for profit. It follows that respondent did not err in his determination. Decision will be entered under Rule 50.